**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DIANE MATTINGLY and ANTON BROWN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. |
| | ) |
| | ) |
| UNITED WINTHROP TOWER COOPERATIVE, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

Diane Mattingly and Anton Brown, for their Complaint against United Winthrop Tower Cooperative, Inc. ("United Winthrop"), allege as follows:

## I.    INTRODUCTION

1.    Diane Mattingly and Anton Brown are people with disabilities who have lived together as life partners for 20 years at the United Winthrop cooperative building.  As a result of Ms. Mattingly's disability — severe epilepsy including grand mal seizures — they have requested that United Winthrop make reasonable accommodations to its rules and policies to accommodate some of the known side effects of the medications she is required to take.  United Winthrop has refused to do so.  United Winthrop has refused even to engage in a dialogue about such accommodations, in violation of the Fair Housing Amendments Act (the "FHA") and the Rehabilitation Act.

2.    Since October 2011, United Winthrop has engaged in a continuing course of conduct in violation of the Act by threatening Ms. Mattingly and Mr. Brown with eviction based solely on allegations that Ms. Mattingly has intermittently exhibited certain unusual behavior, such as moving another co-op member's laundry in the laundry room, arguing with United

Winthrop's building manager, and having lengthy discussions with the building security guard. In October 2011, United Winthrop requested that Mr. Brown attend a "hearing" before its Board of Directors about Ms. Mattingly's alleged behavior.

3.      United Winthrop was informed by Ms. Mattingly and Mr. Brown's legal counsel that to the extent that Ms. Mattingly had engaged in any unusual behavior, it was the result of the medications that she was taking to control her epilepsy. The medications that Ms. Mattingly is required to take have significant side effects, including anxiety, agitation or hostility, difficulty concentrating, moodiness, nervousness, as well as forgetfulness. United Winthrop's response to this information was to question Ms. Mattingly's disability and to put Ms. Mattingly and Mr. Brown on "probation," leaving them under the constant threat of immediate eviction by United Winthrop.

## II.     JURISDICTION AND VENUE

4.      This Court has original jurisdiction over the FHA and the Rehabilitation Act claims of this action under 28 U.S.C. § 1331 and 42 U.S.C. § 3613(a), and supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367(a). Plaintiff's claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 3613(c)(l).

5.      Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b), because Defendant resides there and because all of the events or omissions giving rise to Plaintiffs' claims arose there.

## III.     PARTIES

6.      Ms. Mattingly and Mr. Brown live together with their 20-year-old son, Christopher Brown, in apartment 1908 at United Winthrop Towers Cooperative located at 4848 N. Winthrop Towers, Chicago, Illinois. Mr. Brown has lived at this cooperative for the past 25 years. Ms. Mattingly has lived there for the past 20 years.

2

7.     United Winthrop is a not-for-profit Illinois corporation that operates as a housing cooperative which provides federally funded, project based Section 8 housing (42 U.S.C. § 1437(f)).  United Winthrop is governed by a Board of Directors elected by United Winthrop's members.  Under Illinois law, a cooperative is considered a "hybrid," in that cooperative members own stock in the cooperative and also have a leasehold interest.

## IV.     FACTS

### A.     Diane Mattingly and Anton Brown's Housing and Disabilities

8.     Ms. Mattingly and Mr. Brown are members of United Winthrop.  Until 2011, they lived at United Winthrop without incident.  As members of United Winthrop, Ms. Mattingly and Mr. Brown own a share of United Winthrop, paying a monthly membership charge to cover their household's share of any debt service, operating costs, and reserve contributions.  They renew their membership in United Winthrop by signing an annual reauthorization agreement (sometimes referred to as a "lease").  Ms. Mattingly and Mr. Brown signed their reauthorization agreement with United Winthrop on or around October 13, 2011, and submitted the agreement to United Winthrop's building manager, Carolyn Bridges.

9.     The Mattingly/Brown household's total 2011 income is $19,068.  This amount is classified as "extremely low income" by the United States Department of Housing and Urban Development.  As such, they qualify to have part of their membership charge reimbursed to United Winthrop by the federal government.

10.     Ms. Mattingly has a severe case of epilepsy, including grand mal seizures.  Mr. Brown relies on a wheelchair for mobility and also has epilepsy.

11.     Ms. Mattingly requires several different medications to keep her epileptic symptoms under control.  Recently, she was placed on two new medications, levetiracetam and oxcarbazepine.  Prior to these new medications, Ms. Mattingly's grand mal seizures were not

controlled and she had one to two seizures every two to three hours of every day. The new medications, while more effective at controlling her seizures, have significant side effects, including anxiety, agitation or hostility, difficulty concentrating, moodiness, nervousness, as well as forgetfulness. (*See* National Library of Medicine, Consumer Medication Information for levetiracetam and oxcarbazepine, attached as Exhibit 1.)

12.     Due to her epilepsy and the significant side effects of the medications, Ms. Mattingly is dependent on Mr. Brown's care.

**B.     The United Winthrop Board of Directors "Hearing" Regarding Ms. Mattingly's Alleged Behavior**

13.     On October 1, 2011, Mr. Brown attempted to pay the household's monthly membership payment to United Winthrop. United Winthrop refused to accept their payment. Prior to October 2011 the Mattingly/Brown household had never missed a membership payment.

14.     On or about October 23, 2011, Ms. Mattingly and Mr. Brown received a notice of a Board "hearing" purportedly to address complaints about incidents in which Ms. Mattingly had allegedly exhibited unusual behavior. (*See* Notice to Mattingly/Brown from United Winthrop, attached as Exhibit 2.)

15.     The first incident allegedly occurred in the summer or fall of 2011. Ms. Mattingly encountered building manager Carolyn Bridges in the United Winthrop building elevator. Ms. Bridges had in the past suggested that Ms. Mattingly, due to her disability, required assistance with housekeeping (even though the Mattingly/Brown household has passed every cleaning inspection conducted by United Winthrop). In the elevator, Ms. Bridges raised this issue again with Ms. Mattingly. Ms. Mattingly was upset by this, and she and Ms. Bridges allegedly argued.

16.     The next alleged incident occurred in the building's laundry room. This laundry room has only one table for folding laundry. Sometime in the fall of 2011, Ms. Mattingly was in

the laundry room. Ms. Mattingly allegedly moved some of another member's laundry to a different location on the table. The other member objected and the two argued.

17. United Winthrop also alleged that Ms. Mattingly occasionally dumps her refuse from a garbage bag directly into the garbage chute, and then brings the bag back to her apartment, rather than tossing the bagged refuse down the chute.

18. Finally, United Winthrop alleged that Ms. Mattingly has lengthy conversations in the lobby with the security guard of the building.

19. On October 26, 2011, the United Winthrop Board of Directors held a meeting to address the complaints concerning Ms. Mattingly.

20. The meeting convened by United Winthrop's Board of Directors was conducted in the Hibiscus Room, which is located in the lower level of the United Winthrop building. The primary entrance of the room can only be reached by going down a flight of stairs. Because Mr. Brown relies on a wheelchair for mobility, he was forced to take a circuitous route through the building's garage to reach the room. As a result, Mr. Brown arrived late to the meeting. United Winthrop's attorney harangued Mr. Brown about his late arrival. United Winthrop's attorney went so far as to ask Mr. Brown if he expected special treatment because he had a disability.

21. At this meeting, United Winthrop informed Mr. Brown that it was tired of dealing with Ms. Mattingly's problems and confusion. At the conclusion of the meeting, United Winthrop stated that the only way Mr. Brown and his son could stay at the cooperative would be if Ms. Mattingly left.

22. After the October 26, 2011 meeting, United Winthrop continued to refuse to accept monthly member payments from Ms. Mattingly and Mr. Brown, and has denied them extermination and repair services.

23.     On December 14, 2011, counsel for Ms. Mattingly and Mr. Brown sent a letter to United Winthrop's counsel notifying United Winthrop of its duties under the Fair Housing Amendments Act, 42 U.S.C. § 3604(f), to provide reasonable accommodations to Ms. Mattingly and Mr. Brown.  (*See* Plaintiffs' December 14, 2011 Demand Letter to United Winthrop, attached as Exhibit 3.)

24.     United Winthrop denied any such duty.  (*See* United Winthrop's counsel's December 16, 2011 letter, attached as Exhibit 4.)

25.     On January 27, 2012, Mr. Brown received a letter from United Winthrop.  The letter notified Mr. Brown that he and all members of his household were on probation.  The probation was conditioned on their not engaging in any behavior that the Board considered an "incident."  The letter warned Mr. Brown that if there were "any more incidents involving yourself, members of your households or guest[s] to your household United Winthrop will move for immediate eviction."  (*See* United Winthrop's January 27, 2012 letter, attached as Exhibit 5.)

26.     The letter also conditioned the probation on Ms. Mattingly and Mr. Brown making the monthly member payments that United Winthrop had previously refused.

## COUNT I
## VIOLATIONS OF THE FAIR HOUSING AMENDMENTS ACT 42 U.S.C § 3604(f)

27.     Ms. Mattingly and Mr. Brown re-allege and incorporate Paragraphs 1 – 26 as if set forth fully herein.

28.     The FHA prohibits a housing provider from discriminating against any disabled person or any individual associated with that person "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling."  42 U.S.C. § 3604(f)(2).

29.    Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling…." 42 U.S.C. § 3604(f)(3)(B).

30.    Ms. Mattingly's severe epilepsy requires her to take medications that cause anxiety, agitation, difficulty with comprehension and concentration, and irritability.

31.    United Winthrop has violated the law by placing Plaintiffs on probation and threatening them with eviction solely on the basis of Ms. Mattingly's disability-related behavior.

32.    Ms. Mattingly has no history of violent or criminal behavior, and Ms. Mattingly's disability-related behavior never presented a physical threat to anyone.

33.    United Winthrop has violated the law by refusing to engage in any dialogue with Plaintiffs about accommodations that might be made to United Winthrop's rules.

34.    United Winthrop has violated the law by failing to provide Ms. Mattingly and Mr. Brown an opportunity to cure this non-violent behavior.

35.    United Winthrop has violated 42 U.S.C. § 3604(f)(3)(B) by refusing to accommodate Ms. Mattingly's disability-related behavior.

## COUNT II
## VIOLATIONS OF THE FAIR HOUSING AMENDMENTS ACT 42 U.S.C § 3617

36.    Ms. Mattingly and Mr. Brown re-allege and incorporate Paragraphs 1 – 35 as if set forth fully herein.

37.    Under the FHA, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted" by the FHA.  42 U.S.C. § 3617.

38.     In an attempt to coerce Mr. Brown into expelling his partner of 20 years from their home, United Winthrop presented him with the Hobson's choice of expelling Ms. Mattingly or being evicted himself, along with the couple's son.  Moreover, United Winthrop has withheld services from Ms. Mattingly and Mr. Brown since October 2011.

39.     These actions by United Winthrop, designed to intimidate and coerce Ms. Mattingly and Mr. Brown to leave, are violations of 42 U.S.C. § 3617.

40.     At all times relevant to this action, United Winthrop has acted intentionally, willfully and/or in reckless disregard for the rights of Ms. Mattingly and Mr. Brown.

### COUNT III
### VIOLATIONS OF THE REHABILITATION ACT

41.     Ms. Mattingly and Mr. Brown re-allege and incorporate Paragraphs 1 – 40 as if set forth fully herein.

42.     Ms. Mattingly and Mr. Brown's unit at United Winthrop is subsidized housing and receives federal funding.  Because the building receives federal funding, it must comply with Section 504 of the Rehabilitation Act (29 U.S.C. § 794).

43.     Section 504 and its implementing regulations prohibit discrimination based on disability and require housing entities to provide reasonable accommodations to residents with disabilities.   29 U.S.C. § 794; 24 C.F.R. § 8.33.    Thus, a housing provider "shall make reasonable accommodations to the known physical or mental limitations" of its residents.   24 C.F.R. § 8.11; See 24 C.F.R. § 8.33.  By refusing to provide reasonable accommodations to the Ms. Mattingly and Mr. Brown, United Winthrop has violated Section 504 of the Rehabilitation Act.

## COUNT IV
## <u>BREACH OF CONTRACT</u>

44.     Ms. Mattingly and Mr. Brown re-allege and incorporate Paragraphs 1 – 43 as if set forth fully herein.

45.     United Winthrop and Ms. Mattingly and Mr. Brown entered into the United Winthrop Tower Occupancy Agreement (*See* "the Occupancy Agreement," attached as Exhibit 6.)   Article 12 of the Occupancy Agreement includes a provision which states:  "[t]he Member expressly agrees that there exists under this Occupancy Agreement a landlord tenant relationship…."

46.     Ms. Mattingly and Mr. Brown have performed their obligations under the Occupancy Agreement.

47.     United Winthrop has breached the Occupancy Agreement including as follows:

   a.   Refusing to accept monthly payments from Ms. Mattingly and Mr. Brown;

   b.   Threatening to evict Ms. Mattingly and Mr. Brown without a proper basis;

   c.   Placing Ms. Mattingly and Mr. Brown on probation without a proper basis;

   d.   Threatening to evict Ms. Mattingly and Mr. Brown for alleged behavior that is the result of Ms. Mattingly's disabilities;

   e.   Placing Ms. Mattingly and Mr. Brown on probation for alleged behavior that is the result of Ms. Mattingly's disabilities; and

   f.   Refusing to provide maintenance and extermination services.

48.     Ms. Mattingly and Mr. Brown have incurred injury, and are at risk of continued and further injury, as a result of United Winthrop's breaches of the Occupancy Agreement.

WHEREFORE, Plaintiffs respectfully request that this Court:

A.   Declare that Defendant's acts and omissions constitute illegal discrimination under the Fair Housing Amendments Act, 42 U.S.C. § 3604(f) and illegal coercion under 42 U.S.C. § 3617;

B.   Issue a permanent injunction requiring Defendant to:

   i.   Immediately rescind and terminate the probation that Defendant has placed upon all members of the Mattingly/Brown household;

   ii.   Develop and implement a procedure that provides for:

      a.   Notification to Ms. Mattingly and Mr. Brown of any alleged infraction of United Winthrop rules, including:

         (i)   Notice of Ms. Mattingly and Mr. Brown's right under the Fair Housing Amendments Act and the Rehabilitation Act to request a reasonable accommodation;

         (ii)   Allowance of a reasonable period time of no less than 30 days to cure any alleged infraction;

         (iii)   If no cure is or can be accomplished, allowance of a reasonable period of time of no less than 90 days to submit a request for a reasonable accommodation in writing;

         (iv)   Notice that Ms. Mattingly and Mr. Brown have the option to obtain legal assistance to prepare such a request; and

         (v)   Notice that Ms. Mattingly and Mr. Brown have the option to obtain legal assistance to protect other rights granted by the Fair Housing Amendments Act, the Rehabilitation Act, or by statute or Constitution of the State of Illinois or of the United States.

10

b. If United Winthrop refuses a request from Ms. Mattingly and Mr. Brown for a reasonable accommodation that has not arisen from felonious criminal activity on the part of Ms. Mattingly, Mr. Brown, or any other member or guest of their household, United Winthrop must prior to any eviction proceeding:

(i) Put the refusal in writing, including a full and comprehensive explanation for such refusal; and

(ii) Offer to mediate the matter before an independent mediator.[1]

C. Award Plaintiffs all appropriate and allowable damages resulting from Defendant's illegal discrimination;

D. Award Plaintiffs all appropriate and allowable damages for Defendant's breach of contract;

E. Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

F. Grant any other relief this Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs request a trial by jury.

---

[1] For example, the Center for Conflict Resolution, based in Chicago, Illinois, provides *pro bono* mediation services.

Dated:  February 29, 2012               Respectfully submitted,

                                          DIANE MATTINGLY and ANTON BROWN


                                         By:     /s/ Greg Shinall               
                                                  One of their attorneys

Greg Shinall
Gwen G. Nolan
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
v: 312-641-3200
f: 312-641-6492
shinall@sperling-law.com
gnolan@sperling-law.com

Celiza P. Bragança
Kenneth M. Walden
Access Living of Metropolitan Chicago
115 West Chicago Avenue
Chicago, Illinois 60654
v: 312-640-2100
f: 312-640-2139
lbraganca@accessliving.org
kwalden@accessliving.org

# EXHIBIT 1

U.S. National Library of Medicine - The World's Largest Medical Library

About | Home |   Follow us |   Add us | Help

PubMed Health   ▼    [                    ]   Search

PubMed Health. A service of the National Library of Medicine, National Institutes of Health.

AHFS Consumer Medication Information [Internet]. Bethesda (MD): American Society of Health-System Pharmacists; 2000-2011.

# Levetiracetam    (lee ve tye ra' se tam)

Last Revision: September 1, 2009.

## Why is this medication prescribed?

Levetiracetam is used in combination with other medications to treat certain types of seizures in people with epilepsy. Levetiracetam is in a class of medications called anticonvulsants. It works by decreasing abnormal excitement in the brain.

## How should this medicine be used?

Levetiracetam comes as a solution (liquid) and a tablet to take by mouth. It is usually taken twice a day, once in the morning and once at night, with or without food. Try to take levetiracetam at around the same times every day. Follow the directions on your prescription label carefully, and ask your doctor or pharmacist to explain any part you do not understand. Take levetiracetam exactly as directed. Do not take more or less of it or take it more often than prescribed by your doctor.

Swallow the tablets whole; do not split, chew, or crush them.

If you are taking the oral solution, do not use a household spoon to measure your dose. You might not get the right amount of medication. Ask your doctor or pharmacist to recommend a medicine dropper, spoon, cup, or syringe and to show you how to use it to measure your medication.

Your doctor may start you on a low dose of levetiracetam and gradually increase your dose, not more often than once every 2 weeks.

Levetiracetam controls epilepsy but does not cure it. Continue to take levetiracetam even if you feel well. Do not stop taking levetiracetam without talking to your doctor, even if you experience side effects such as unusual changes in behavior or mood. If you suddenly stop taking levetiracetam, your seizures may become worse. Your doctor will probably decrease your dose gradually.

Your doctor or pharmacist will give you the manufacturer's patient information sheet (Medication Guide) when you begin treatment with levetiracetam and each time you refill your prescription. Read the information carefully and ask your doctor or pharmacist if you have any questions. You can also visit the Food and Drug Administration (FDA) website (http://www.fda.gov/Drugs) or the manufacturer's website to obtain the Medication Guide.

## Other uses for this medicine

This medication may be prescribed for other uses; ask your doctor or pharmacist for more information.

## What special precautions should I follow?

Before taking levetiracetam,

- tell your doctor and pharmacist if you are allergic to levetiracetam or any other medications.

- tell your doctor and pharmacist what prescription and nonprescription medications, vitamins, nutritional supplements, and herbal products you are taking or plan to take. Your doctor may need to change the doses of your medications or monitor you carefully for side effects.

- tell your doctor if you have or have ever had kidney disease.

- tell your doctor if you are pregnant or plan to become pregnant. If you become pregnant while taking levetiracetam, call your doctor. Do not breast-feed while you are taking levetiracetam.

- you should know that levetiracetam may make you dizzy or drowsy. Do not drive a car or operate machinery until you know how this medication affects you.

- you should know that your mental health may change in unexpected ways and you may become suicidal (thinking about harming or killing yourself or planning or trying to do so) while you are taking levetiracetam for the treatment of epilepsy, mental illness, or other conditions. A small number of adults and children 5 years of age and older (about 1 in 500 people) who took antiepileptics such as levetiracetam to treat various conditions during clinical studies became suicidal during their treatment. Some of these people developed suicidal thoughts and behavior as early as one week after they started taking the medication. There is a risk that you may experience changes in your mental health if you take an antiepileptic medication such as levetiracetam, but there may also be a risk that you will experience changes in your mental health if your condition is not treated. You and your doctor will decide whether the risks of taking an antiepileptic medication are greater than the risks of not taking the medication. You, your family, or your caregiver should call your doctor right away if you experience any of the following symptoms: panic attacks; agitation or restlessness; new or worsening irritability, anxiety, or depression; acting on dangerous impulses; difficulty falling or staying asleep; aggressive, angry, or violent behavior; mania (frenzied, abnormally excited mood); talking or thinking about wanting to hurt yourself or end your life; withdrawing from friends and family; preoccupation with death and dying; giving away prized possessions; or any other unusual changes in behavior or mood. Be sure that your family or caregiver knows which symptoms may be serious so they can call the doctor if you are unable to seek treatment on your own.

## What special dietary instructions should I follow?

Unless your doctor tells you otherwise, continue your normal diet.

## What should I do if I forget a dose?

If it has only been a few hours since the time you were scheduled to take the dose, take the missed dose as soon as you remember it. However, if it is almost time for the next dose, skip the missed dose and continue your regular dosing schedule. Do not take a double dose to make up for a missed one.

## What side effects can this medication cause?

Levetiracetam may cause side effects. Tell your doctor if any of these symptoms are severe or do not go away:

drowsiness

weakness

unsteady walking

coordination problems

headache

pain

forgetfulness

anxiety

agitation or hostility

dizziness

moodiness

nervousness

numbness, burning, or tingling in the hands or feet

loss of appetite

vomiting

diarrhea

constipation

changes in skin color

Case: 1:12-cv-01434 Document #: 1 Filed: 02/29/12 Page 16 of 52 PageID #:16

Some side effects can be serious. If you experience any of the following symptoms, call your doctor immediately:

depression

hallucinating (hearing voices or seeing visions that do not exist)

thoughts of killing yourself

seizures that are worse or different than the seizures you had before

fever, sore throat, and other signs of infection

double vision

itching

rash

swelling of the face

Levetiracetam may cause other side effects. Call your doctor if you have any unusual problems while taking this medication.

If you experience a serious side effect, you or your doctor may send a report to the Food and Drug Administration's (FDA) MedWatch Adverse Event Reporting program online [at http://www.fda.gov/Safety/MedWatch] or by phone [1-800-332-1088].

## What storage conditions are needed for this medicine?

Keep this medication in the container it came in, tightly closed, and out of reach of children. Store it at room temperature and away from excess heat and moisture (not in the bathroom). Throw away any medication that is outdated or no longer needed. Talk to your pharmacist about the proper disposal of your medication.

## In case of emergency/overdose

In case of overdose, call your local poison control center at 1-800-222-1222. If the victim has collapsed or is not breathing, call local emergency services at 911.

Symptoms of overdose may include:

drowsiness

agitation

aggression

decreased consciousness or loss of consciousness

difficulty breathing

## What other information should I know?

Keep all appointments with your doctor.

Do not let anyone else take your medication. Ask your pharmacist any questions you have about refilling your prescription.

It is important for you to keep a written list of all of the prescription and nonprescription (over-the-counter) medicines you are taking, as well as any products such as vitamins, minerals, or other dietary supplements. You should bring this list with you each time you visit a doctor or if you are admitted to a hospital. It is also important information to carry with you in case of emergencies.



American Society of Health-System Pharmacists, Disclaimer

AHFS® Consumer Medication Information. © Copyright, 2011. The American Society of Health-System Pharmacists, Inc., 7272 Wisconsin Avenue, Bethesda, Maryland. All Rights Reserved. Duplication for commercial use must be authorized by ASHP.

Case: 1:12-cv-01434 Document #: 1 Filed: 02/29/12 Page 17 of 52 PageID #:17

**The following brand names are from RxNorm, a standardized nomenclature for clinical drugs produced by the National Library of Medicine:**

## Brand names

- Keppra

U.S. National Library of Medicine - The World's Largest Medical Library

About | Home |    Follow us |    Add us | Help

PubMed Health    ▾        Search

PubMed Health. A service of the National Library of Medicine, National Institutes of Health.

AHFS Consumer Medication Information [Internet]. Bethesda (MD): American Society of Health-System Pharmacists; 2000-2011.

# Oxcarbazepine    (ox car baz' e peen)

Last Revision: September 1, 2009.

## Why is this medication prescribed?

Oxcarbazepine is used alone or in combination with other medications to control certain types of seizures. Oxcarbazepine is in a class of medications called anticonvulsants. It works by decreasing abnormal electrical activity in the brain.

## How should this medicine be used?

Oxcarbazepine comes as a tablet and a suspension (liquid) to take by mouth. It is usually taken every 12 hours (twice a day) with or without food. Take oxcarbazepine at around the same times every day. Follow the directions on your prescription label carefully, and ask your doctor or pharmacist to explain any part you do not understand. Take oxcarbazepine exactly as directed. Do not take more or less of it or take it more often than prescribed by your doctor.

Shake the suspension well right before each use to mix the medication evenly. Use the oral dosing syringe that came with the medication to withdraw the right amount of suspension from the bottle. You can swallow the suspension straight from the syringe or you can mix it with a small glass of water and swallow the mixture. Wash the syringe with warm water and allow it to dry thoroughly after use.

Your doctor will probably start you on a low dose of oxcarbazepine and gradually increase your dose, not more often than once every 3 days. If you were taking another medication to treat your seizures and are switching to oxcarbazepine, your doctor may gradually decrease your dose of the other medication while increasing your dose of oxcarbazepine. Follow these directions carefully and ask your doctor if you are not sure how much medication you should take.

Oxcarbazepine may help control your seizures but will not cure your condition. Continue to take oxcarbazepine even if you feel well. Do not stop taking oxcarbazepine without talking to your doctor, even if you experience side effects such as unusual changes in behavior or mood. If you suddenly stop taking oxcarbazepine, your seizures may get worse. Your doctor will probably decrease your dose gradually.

Your doctor or pharmacist will give you the manufacturer's patient information sheet (Medication Guide) when you begin treatment with oxcarbazepine and each time you refill your prescription. Read the information carefully and ask your doctor or pharmacist if you have any questions. You can also visit the Food and Drug Administration (FDA) website (http://www.fda.gov/Drugs) or the manufacturer's website to obtain the Medication Guide.

## Other uses for this medicine

Oxcarbazepine is also sometimes used to treat bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of frenzied abnormal excitement, and other abnormal moods). Talk to your doctor about the possible risks of using this medication for your condition.

This medication may be prescribed for other uses. Ask your doctor or pharmacist for more information.

## What special precautions should I follow?

Before taking oxcarbazepine:

- tell your doctor and pharmacist if you are allergic to oxcarbazepine, carbamazepine (Carbatrol, Epitol, Equetro, Tegretol), any other medications, or any of the inactive ingredients in oxcarbazepine tablets or

suspension. Ask your pharmacist for a list of the inactive ingredients in oxcarbazepine tablets or suspension.

- tell your doctor and pharmacist what prescription and nonprescription medications, vitamins, nutritional supplements, and herbal products you are taking or plan to take. Be sure to mention any of the following: amiodarone (Cordarone); amitriptyline (Elavil); calcium channel blockers such as amlodipine (Norvasc), diltiazem (Cardizem, Dilacor, Tiazac), felodipine (Plendil), isradipine (DynaCirc), nicardipine (Cardene), nifedipine (Procardia), nimodipine (Nimotop), nisoldipine (Sular), and verapamil (Calan, Covera, Isoptin, Verelan); chlorpromazine (Thorazine);clomipramine (Anafranil); cyclophosphamide (Cytoxan, Neosar); desmopressin (DDAVP, Minirin, Stimate); diazepam (Valium); diuretics ('water pills'); hormonal contraceptives (birth control pills, rings, patches, implants, injections, and intrauterine devices); indapamide (Natrilix); other medications for seizures such as carbamazepine (Carbatrol, Epitol, Equetro, Tegretol), phenobarbital, phenytoin (Dilantin), and valproic acid (Depakene, Depakote); proton-pump inhibitors such as lansoprazole (Prevacid), omeprazole (Prilosec), and pantoprazole (Protonix); theophylline (Theo-Dur); and selective serotonin reuptake inhibitors (SSRIs) such as citalopram (Celexa), duloxetine (Cymbalta), escitalopram (Lexapro), fluoxetine (Prozac, Sarafem), fluvoxamine (Luvox), paroxetine (Paxil), and sertraline (Zoloft). Other medications may interact with oxcarbazepine, so be sure to tell your doctor and pharmacist about all the medications you are taking, even those that do not appear on this list. Your doctor may need to change the doses of your medications or monitor you carefully for side effects.

- tell your doctor if you have or have ever had kidney or liver disease.

- tell your doctor if you are pregnant, plan to become pregnant, or are breast-feeding. If you are using hormonal contraceptives, you should know that this type of birth control may not work well when used with oxcarbazepine. Hormonal contraceptives should not be used as your only method of birth control while you are taking this medication. Talk to your doctor about birth control methods that will work for you. Call your doctor if you miss a period or think you may be pregnant while you are taking oxcarbazepine.

- you should know that this medication may make you drowsy or dizzy, or may cause vision changes. Do not drive a car or operate machinery until you know how this medication affects you.

- remember that alcohol can add to the drowsiness caused by this medication.

- you should know that your mental health may change in unexpected ways and you may become suicidal (thinking about harming or killing yourself or planning or trying to do so) while you are taking oxcarbazepine for the treatment of epilepsy, mental illness, or other conditions. A small number of adults and children 5 years of age and older (about 1 in 500 people) who took antiepileptics such as oxcarbazepine to treat various conditions during clinical studies became suicidal during their treatment. Some of these people developed suicidal thoughts and behavior as early as one week after they started taking the medication. There is a risk that you may experience changes in your mental health if you take an antiepileptic medication such as oxcarbazepine, but there may also be a risk that you will experience changes in your mental health if your condition is not treated. You and your doctor will decide whether the risks of taking an antiepileptic medication are greater than the risks of not taking the medication. You, your family, or your caregiver should call your doctor right away if you experience any of the following symptoms: panic attacks; agitation or restlessness; new or worsening irritability, anxiety, or depression; acting on dangerous impulses; difficulty falling or staying asleep; aggressive, angry, or violent behavior; mania (frenzied, abnormally excited mood); talking or thinking about wanting to hurt yourself or end your life; withdrawing from friends and family; preoccupation with death and dying; giving away prized possessions; or any other unusual changes in behavior or mood. Be sure that your family or caregiver knows which symptoms may be serious so they can call the doctor if you are unable to seek treatment on your own.

## What special dietary instructions should I follow?

Unless your doctor tells you otherwise, continue your normal diet.

## What should I do if I forget a dose?

Before you begin your treatment, talk to your doctor about what you should do if you accidentally miss a dose. Be sure to ask your doctor how long you should wait between taking a missed dose and taking your next scheduled dose of oxcarbazepine. Do not take a double dose to make up for a missed one.

## What side effects can this medication cause?

Case: 1:12-cv-01434 Document #: 1 Filed: 02/29/12 Page 20 of 52 PageID #:20

Oxcarbazepine may cause side effects. Tell your doctor if any of these symptoms are severe or do not go away:

- dizziness
- drowsiness
- vision changes
- double vision
- fast, repeating eye movements that you cannot control
- diarrhea
- constipation
- heartburn
- stomach pain
- loss of appetite
- changes in the way food tastes
- dry mouth
- weight gain
- shaking of a part of the body that you cannot control
- difficulty coordinating movements
- falling down
- slowed movements or thoughts
- speech problems
- forgetfulness
- difficulty concentrating
- nervousness
- mood swings
- back pain
- muscle weakness or sudden tightness
- acne
- toothache
- earache
- hot flushes
- increased sweating
- cold symptoms
- nosebleed
- swelling, redness, irritation, burning, or itching of the vagina
- white vaginal discharge

Some side effects can be serious. If you experience any of the following symptoms, call your doctor immediately:

- swelling of the face, throat, tongue, lips, eyes, hands, feet, ankles, or lower legs
- seizures that last longer or happen more often than in the past
- headache
- unusual thirst

Case: 1:12-cv-01434 Document #: 1 Filed: 02/29/12 Page 21 of 52 PageID #:21

nausea

vomiting

weakness

confusion

decreased alertness

rash

bumps or blisters in the mouth, on skin, or genitals

red or purple-colored blotches or dots on skin

red, irritated eyes

itching

fever

swollen glands in the neck or under the arms

yellowing of the skin or eyes

unusual bruising or bleeding

bleeding from the rectum or blood in stools

sore throat, cough, chills, and other signs of infection

increased, decreased, or painful urination

joint pain

chest pain

If you experience a serious side effect, you or your doctor may send a report to the Food and Drug Administration's (FDA) MedWatch Adverse Event Reporting program online [at http://www.fda.gov/Safety/MedWatch] or by phone [1-800-332-1088].

## What storage conditions are needed for this medicine?

Keep this medication in the container it came in, tightly closed, and out of reach and sight of children. Store it at room temperature and away from excess heat and moisture (not in the bathroom). Throw away any unused suspension 7 weeks after the bottle is first opened and any medication that is outdated or no longer needed. Talk to your pharmacist about the proper disposal of your medication.

## In case of emergency/overdose

In case of overdose, call your local poison control center at 1-800-222-1222. If the victim has collapsed or is not breathing, call local emergency services at 911.

## What other information should I know?

Keep all appointments with your doctor and the laboratory. Your doctor may order certain lab tests to check your response to oxcarbazepine.

Do not let anyone else take your medication. Ask your pharmacist any questions you have about refilling your prescription.

It is important for you to keep a written list of all of the prescription and nonprescription (over-the-counter) medicines you are taking, as well as any products such as vitamins, minerals, or other dietary supplements. You should bring this list with you each time you visit a doctor or if you are admitted to a hospital. It is also important information to carry with you in case of emergencies.



American Society of Health-System Pharmacists, Disclaimer

AHFS® Consumer Medication Information. © Copyright, 2011. The American Society of Health-System

Case: 1:12-cv-01434 Document #: 1 Filed: 02/29/12 Page 22 of 52 PageID #:22

Pharmacists, Inc., 7272 Wisconsin Avenue, Bethesda, Maryland. All Rights Reserved. Duplication for commercial use must be authorized by ASHP.

**The following brand names are from RxNorm, a standardized nomenclature for clinical drugs produced by the National Library of Medicine:**

Brand names

- Trileptal

# EXHIBIT 2

## NOTICE TO MEMBER OF BOARD OF DIRECTORS' HEARING ON COMPLAINTS CONCERNING ALLEGED VIOLATION OF COOPERATIVE RULES AND REGULATIONS, BY LAWS OR OCCUPANCY AGREEMENT

TO:    Anton Brown and Diane Mattingly
       4848 North Winthrop Avenue, Apt. 1908
       Chicago, IL 60640

The Board of Directors of United Winthrop Tower Cooperative (Cooperative) voted to hold a hearing at the time and place set out below with reference to complaints received by the Cooperative concerning your conduct or conduct by persons for whom you are responsible under Cooperative Rules and Regulations as described below.

      You are notified that you have a right to be present and to have either an open or a closed hearing as you may choose. You may also have witnesses present to speak on your behalf and to be represented by an attorney if you should so choose. You are further notified that if, after conducting the hearing, the Board of Directors concludes that you are in violation of the Cooperative's By Laws or your Occupancy Agreement or the Rules and Regulations of the Cooperative, the Board of Directors has the authority to terminate your membership in the Cooperative and right of occupancy in the above dwelling unit, in event current defaults which have resulted in such terminations shall be cured resulting from a Court order, whereupon you will be served a 10-Day Notice of Termination of your membership and to surrender your Membership Certificate, Occupancy Agreement and possession of your dwelling unit.

PLACE OF HEARING:       Hibiscus Room, Lower Level
                          4848 North Winthrop Avenue
                          Chicago, IL 60640

DATE OF HEARING:       October 26, 2011

DAY OF HEARING:       Wednesday

TIME OF HEARING:       6:00 p.m.

CONDUCT COMPLAINED OF:    Repeated violations of improperly disposing of refuse on the 19th floor and loitering by you or members of your household domestic disturbance in laundry room and disturbing another member's property, all in violation of the Rules and Regulations of the Cooperative and your Occupancy Agreement.

                                UNITED WINTHROP TOWER COOPERATIVE

                                By: _____

                                Carolyn Bridges, Manager

# EXHIBIT 3



**ACCESS LIVING**

VIA E-MAIL

Herbert H. Fisher
Herbert H. Fisher Law Office, P.C.
155 N. Michigan Ave. Suite 622
Chicago IL 60601
hhfisher@aol.com

**Re: Anton Brown and Diane Mattingly**

Dear Mr. Fisher:

I represent Anton Brown and Diane Mattingly. Mr. Brown and Ms. Mattingly are members of the United Winfred Tower Cooperative, 4848 North Winthrop ("the cooperative"). Both Mr. Brown and Ms. Mattingly have disabilities. I write because your client, the cooperative, has violated Mr. Brown and Ms. Mattingly's rights under the Fair Housing Act. In particular, your client's attempt to evict Ms. Mattingly from her home of about 20 years by trying to force her long time partner, Mr. Brown, to sign a lease which excludes Ms. Mattingly is illegal and unconscionable.

By way of background, Access Living is a Center for Independent Living for people with disabilities established pursuant to the Rehabilitation Act, 29 U.S.C. § 796f. Access Living's statutorily mandated mission includes assisting individuals with disabilities in obtaining equal access to and participation in services, programs, activities, resources, and facilities, whether public or private. See id. § 796f-4(b)(1)(D). In this capacity, we provide legal representation to individuals with disabilities in disability discrimination cases.

I.      Factual Background

Mr. Brown has been living at the cooperative for some 25 years. His partner, Ms. Mattingly, has been living at the cooperative for 20 years. Both Mr. Brown and Ms. Mattingly have disabilities. Mr. Brown and Ms. Mattingly also have a 20 year old son who lives with them at the cooperative. Mr. Brown uses a wheelchair and has epilepsy. Ms. Mattingly has a severe case of epilepsy and suffers from short and long term memory loss. She is prone to long, rambling and somewhat incoherent speech and has difficulty with comprehension and concentration. As a result, Ms. Mattingly is dependent on Mr. Brown for support and relies on him for care..

Ms. Mattingly suffers from Grand Mal seizures. She was recently placed on a new medication. Prior to being placed on this new medication, Ms. Mattingly's seizures were uncontrollable. She would have 1 to 2

1

seizures every 2 – 3 hours. These seizures occurred despite the fact she was already on 3 medications for epilepsy and seizure control. Since being placed on her new medication Ms. Mattingly's condition has stabilized. She no longer has seizures. Unfortunately, this new medication has strong side effects. These side effects include drowsiness, weakness, forgetfulness, anxiety. Significantly, agitation and hostility are also side effects of this medication.

Mr. Brown and Ms. Mattingly have never missed a shareholders' payment while living at the cooperative. Their apartment has passed every cleaning inspection. Ms. Mattingly has never been charged with a crime and has no history of violent behavior.

Sometime during the late summer or fall, Ms. Mattingly apparently was involved in two incidents. The first incident occurred in the cooperative's elevator when words were exchanged between Ms. Mattingly and the manager of the cooperative, Carolyn Bridges. Ms. Mattingly grew agitated, as happens with her new medication, and used harsh language. Coincidentally, the incident was reportedly witnessed by the president of the cooperative's board, who happened to be in the elevator.

The other incident, involving another member of the cooperative, occurred in the cooperative's laundry room. It appears the table used for folding laundry was covered in its entirety by the other member's laundry. Ms. Mattingly attempted to make some room for herself by moving some of the laundry already on the table to a different location on the table. The other member objected strenuously to this innocuous act. Words were exchanged. Coincidentally again, the vice president of the cooperative's board was also present and observed this disagreement.

Additionally, from time to time, Ms. Mattingly likes to talk to the security guard of the cooperative, that is, to the security guard of the building she lives in. Also, occasionally Ms. Mattingly disposes of garbage by throwing loose refuse down the garbage chute. Ms. Mattingly's disposal of loose garbage is apparently captured by the cooperative's security cameras.

On October 1, Mr. Brown attempted to make his monthly payment to the cooperative. This payment was refused by the cooperative. As of this writing, this practice has continued.

On or about October 23, 2011, Mr. Brown and Ms. Mattingly received a notice from the cooperative's board regarding a "hearing". This hearing supposedly concerned complaints about Ms. Mattingly's conduct. To wit, there were complaints about the incidents in the elevator and laundry room, about the disposal of loose garbage, and loitering. The loitering complaint revolved around Ms. Mattingly talking to the security guard in the cooperative, the building Ms. Mattingly lives in. The hearing was scheduled for October 26, 2011 – just three days after Mr. Brown and Ms. Mattingly received notice.

The notice also referred to violations of the "Cooperative Rules, Regulations, By Laws, Or Occupancy Agreement". Mr. Brown does not possess these documents, and was unable to procure copies of these documents from the cooperative's management personnel.

2

On October 26, 2011 Mr. Brown attempted to attend the hearing. The hearing was held in the Hibiscus Room, located in the lower level of the cooperative. The primary entrance of the Hibiscus Room can only be reached by going down a flight of stairs. Because Mr. Brown relies on a wheelchair to ambulate, he was forced to take a circuitous route through the cooperative's garage to reach the Hibiscus Room. Unfortunately, Mr. Brown does not have a key to the garage's door. He had to wait some twenty minutes for someone to open the garage door for him, which made him late to the hearing. Upon arriving at this hearing, Mr. Brown was promptly lectured by the board's attorney on the importance of timeliness and the lack of respect Mr. Brown showed the cooperative board by being late.

In addition to the cooperative board's attorney, the president, vice president, building manager, and the other board members were present. These individuals apparently constituted the hearing panel. Mr. Brown missed the testimony of the two witnesses against Ms. Mattingly. This was the president and vice president, who so fortuitously happened to be present at the incidents involving Ms. Mattingly. Mr. Brown was allowed to speak on his own behalf for about 5 minutes. Interestingly, the person who instigated the laundry room incident was not a witness at this hearing.

Mr. Brown and Ms. Mattingly signed their reauthorization agreement ("agreement") with the cooperative prior to the hearing, on or around October 13. They turned the agreement over to Carolyn Bridges. Sometime after the hearing, Ms. Bridges informed Mr. Brown that the agreement would be withheld. Ms. Bridges has informed Mr. Brown that he, as head of the household, must exclude Ms. Mattingly from the lease or be evicted himself, as well as his son. This action was taken, apparently, as a result of a decision against Mr. Brown and Ms. Mattingly made by the members of the hearing panel. No written record of the hearing's final disposition was provided to Mr. Brown or Ms. Mattingly.

II.   Fair Housing Act

    a.   42 U.S.C. § 3604(f)

The Fair Housing Amendments Act ("FHA") prohibits housing discrimination against disabled individuals. 42 U.S.C. § 3604(f). Specifically, the FHA prohibits a housing provider from discriminating against any disabled person or any individual associated with that person "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling". 42 U.S.C. § 3604(f)(2). Among other things, the FHA defines discrimination as "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling…." 42 U.S.C. § 3604(f)(3)(B).

Courts have held that it is the duty of housing providers to make reasonable accommodations for disabled individuals. See, e.g. Roe v. Sugar Mills Associates, 820 F. Supp. 636, 639 (1993) (defendant landlord required to make reasonable accommodation to mentally ill plaintiff before evicting plaintiff for plaintiff's behavior); Radlecki v. Joura, 114 F.3d 115, 117 (1997) (mentally ill plaintiff not granted reasonable accommodation by defendant landlord to prepare for pest extermination; "FHA imposes affirmative duty upon landlords to make reasonable accommodations for handicapped persons"); Roe v. City of Boulder, 909 F. Supp. 814, 822 (1995) (before evicting mentally ill plaintiff for his behavior, defendant landlord must "demonstrate that no 'reasonable accommodation' will eliminate or acceptably minimize any risk" plaintiff poses).

3

Ms. Mattingly's severe epilepsy forces her to take medications which affect her temperament. The cooperative, in its hearing notice, accused Ms. Mattingly of two verbal incidents. In response to two minor incidents that resulted from Ms. Mattingly's condition the cooperative, instead of trying to accommodate Ms. Mattingly's disability, summoned Mr. Brown to what was at best a summary hearing. Mr. Brown was informed of the panel's determination verbally, when he was told by Ms. Bridges that he must exclude his partner of 20 years or face eviction himself. No facts point to any attempt by the cooperative to reach a reasonable accommodation with Mr. Brown or Ms. Mattingly.

Additionally, the disability related behavior of a disabled person cannot be the sole reason for an eviction unless that behavior represents a "direct threat to the health or safety of other individuals" or the person's "tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9). The United States Supreme Court has held that the issue in determining whether a direct threat exists is "not whether a risk exists, but whether it is significant." Bragdon v. Abbott, 524 U.S. 624, 649 (1998). The assessment of risk "must be based on medical or other objective evidence" and the determination that a significant risk exists must be objectively reasonable. Id. at 649-50. The Seventh Circuit has provided additional factors to be utilized in making this determination. These factors include "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm." Emerson v. N. States Power Co., 256 F.3d 506, 514 (7th Cir. 2001). As noted above, Ms. Mattingly has no history of physically violent behavior and no criminal record. Further, given the nature of her disability, her slight size, and the side effects of her medication it is hardly credible that Ms. Mattingly poses a direct threat to anyone.

As part of their duty to provide reasonable accommodations to disabled persons, housing providers must provide an opportunity to cure any disability related behaviors that do threaten the health and safety of others. See, e.g. McGary v. City of Portland, 386 F.3d 1259, 1264 (9th Cir. 2004) (in order to meet the reasonable accommodation requirement of the FHA, housing provider must provide disabled person with time to clean person's backyard); Anast v. Commonwealth Apartments, 956 F. Supp. 792, 801 (N.D. Ill. 1997) (finding, even after judgment of possession had been entered, that an individual with a mental health disability should have been granted an extension of time before eviction proceedings were even even initiated); Douglas v. Kriegsfeld Corp. 884 A.2d 1109, 1127 (D. C. 2005) (landlord providing a disabled defendant with extension of time to comply with housekeeping requirements is a reasonable accommodation under the FHA).

Apparently, the cooperative's building security cameras captured video of Ms. Mattingly throwing loose refuse down the garbage chute. While it is questionable whether this activity survives the direct threat analysis presented supra, assuming arguendo that it does, the cooperative is still required to provide Mr. Brown and Ms. Mattingly an opportunity to cure this behavior. Instead, Mr. Brown was summoned before a summary hearing and told later that, as a result of the hearing's ruling, he had to exclude Ms. Mattingly from the reauthorization agreement. Clearly, no opportunity to cure was provided to Mr. Brown and Ms. Mattingly. This action on the part of the cooperative board is, once again, a failure to provide a reasonable accommodation to disabled persons.

4

As noted above, the FHA also makes it illegal "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person...." 42 U.S.C. § 3604(f)(2)(A). Mr. Brown was notified that the hearing was in the Hisbiscus Room, located in the lower level of the cooperative building. The primary entrance to the Hibiscus Room requires *walking* down a flight of stairs. Because Mr. Brown was unable to use the primary entrance to the Hibiscus Room he was forced to travel through the garage and was late to the hearing. By conducting the hearing in an inaccessible location, which compelled Mr. Brown to negotiate an inconvenient route and arrive late, the cooperative discriminated against Mr. Brown in violation of 42 U.S.C. § 3604(f)(2)(A).

      b.  42 U.S.C. § 3617

The FHA prohibits coercion and intimidation. "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted" by the FHA. 42 U.S.C. § 3617.

For the past several months, the cooperative has refused to accept membership payments from Mr. Brown. As of this writing, the shareholders' payment due December 1 has also been refused. This practice began *before* the hearing held on October 26, 2011.

In addition to the cooperative board's charges discussed in relation to § 3604(f), Ms. Brown was accused of "loitering" by the cooperative board. The Chicago Municipal Code only has prohibitions against gang and narcotics related loitering. *See* §§ 8-4-015 and 8-4-017, Chicago Municipal Code. The Illinois Criminal Code only forbids loitering by sex offenders near public parks. *See* 720 ILCS 5/11-9.4-1. These are criminal laws that obviously do not apply to Ms. Mattingly. The civil analogue to loitering is trespass. I am at a loss to see how Ms. Mattingly can trespass on her own property.

As of this writing, Mr. Brown and Ms. Mattingly have been denied repair and extermination services by the cooperative.

Finally, in a bald faced attempt to coerce Mr. Brown, he was presented with the draconian choice of kicking his longtime partner onto the street (where her survival is questionable) or be evicted himself, along with his and Ms. Mattingly's son.

All of these actions by the cooperative, clearly designed to intimidate and coerce Mr. Brown and Ms. Mattingly, are violations of 42 U.S.C. § 3617.

III.    Conclusion

Because the cooperative has engaged in specific and substantial violations of Mr. Brown's and Ms. Mattingly's civil rights under the FHA, we demand the following:

**ACCESS LIVING** | Center for Service, Advocacy and Social Change for People with Disabilities

115 West Chicago Avenue, Chicago, Illinois 60610

tel: 312.640.2100 | fax: 312.640.2101 | tty: 312.640.2102 | www.accessliving.org

- The cooperative immediately sign and return the reauthorization agreement to Mr. Brown, with no preconditions regarding Ms. Mattingly;
- The cooperative provide written recognition of Ms. Mattingly's rights to live at the cooperative with her partner, Mr. Brown;
- That the cooperative resume providing services to Mr. Brown and Ms. Mattingly;
- Any further administrative procedures held by the cooperative involving disabled persons be held at facilities that accommodate such disabilities;
- That all outstanding shareholders' payments be forgiven and waived;[1]
- That the cooperative resume accepting shareholders' payments from Mr. Brown; and
- The cooperative provide a copy of the occupancy agreement, rules, and regulations of the cooperative to Mr. Brown and Ms. Mattingly.

I hope to resolve these matters with your client without resort to further legal action. Feel free to contact me (contact information below signature) with any questions you may have.

Sincerely,

Mark A. Frazzetto
Volunteer Staff Attorney
**v** (312) 640 - 2179
**e** mfrazzetto@accessliving.org
**f** (312) 640 - 2138

cc: Anton Brown

---

[1] Under the FHA, when "a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages…" 42 U.S.C. § 3613 (c)(1).

6

# EXHIBIT 4

| | |
|---|---|
| **From:** | HHFisher1@aol.com |
| **Sent:** | Friday, December 16, 2011 9:25 AM |
| **To:** | Mark Frazzetto |
| **Subject:** | Fwd: Anton Brown\Diane Mattingly\United Winthrop Towers |

From: HHFisher1@aol.com
To: MFrazzetto@accessliving.orgxxxxx
BCC: aqueen4848@yahoo.com, unitedwinthrop@sbcglobal.net, ivydomenjoud@aol.com, ifisher951@aol.com
Sent: 12/16/2011 9:20:15 A.M. Central Standard Time
Subj: Re: Anton Brown\Diane Mattingly\United Winthrop Towers

Mr. Frazzetto

I regret I was unable to meet your schedule of yeterday; but it is probably better if we can frame the issues in writing with respect to the alleged violations of Federal law described in your six page undated letter addressed to me and faxed dated December 14, 2011 completed at 11.26 am.

I have re-read your letter in order to be sure I comprehended it and did not miss any salient items in it.

In doing so I do not see that it describes any violations under the Fair Housing Act or any other provisions under the National Housing Act,which, according to my long standing understanding, is that the complainant must demonstrate that there was treatment of the complainant that was different than treatment afforded others who do not share the complainant's protected class; and if such demonstration is made, then the burden shifts to the respondent to show that there was non pre-textual justification for the disparate treatment.

I do not find anything in your letter to indicate that any other member of United Winthrop Tower Cooperative would have been treated in any other manner than was afforded Mr. Brown or Ms. Mattingly. We, therefore, do not even reach the need to justify my client's conducting a hearing, pursuant to its By Law duties and authority, to determine whether the safety, peace and quiet of the Cooperative building and other members residing there required the termination of their membership. Mr. Brown and Ms. Mattingly were accorded a hearing at which, again under their By Law authority, acted as the fact finding body and I was charged by Cooperative President to act as the "prosecutor", in which role I undertook, with prior announcement, to give them every latitude to explain to the Board why their membership should not be terminateds; and they each took advantage of the opportunity, together with a ONE representative and two observers..

During the hearing it became apparent to me that Ms. Mattingly was the cause of the serious problems in the building and not Mr. Brown; and this was pointed out to both of them. Later, Mr. Brown spontaneously offered to have Ms. Mattingly to move in order to resolve the issues. He was the following day asked about his offer, and he recanted. That possible solution has not been pursued further.

None of my client's employees or members of its Board knew of either of their disabilities other than Mr. Brown is in a wheel chair. Management, but not the Board, knew their income came from disability benefit payments..

Payments are not being accepted from the members at this time pending a decision by the Board on the issues before it. Acceptance of payment could be construed as a waiver of any rights my client may have to terminate occupancy under Illinois law.

No decision has been reached as of yet. So that any statement regarding termination or reinstatement is premature.

The Members in question received a six day notice of the hearing, which is standard timing given to others. Some may have gotten 7 day notices.

Routinely, when a new member executes an occupancy agreement in duplicate. If Mr. Brown and/or Ms. Mattingly misplaced theirs, they never made a request for a copy which would have been provided.

Re-certification process was handled as with any other member occupant except that a second copy of the 50059 form had to be give to Mr. Brown. The executed form has been processed and a copy being returned to Mr. Brown.

The above commentary is not an exhaustive response to your letter and I am asking my client's management to review carefully to make sure I have I been involved not transmitted any misunderstandings of the actual facts. If so I will notify you promptly.

If you have any facts that there had been any disparate treatment of these members, please call it to our attention so it also can be evaluated.

But, again the Board has not made any decision as yet and basic issues you raise, if meritorious, is quite premature.

We look further to further discussion of the matter as it has developed.

Herbert H. Fisher
Vonnage 312 335 0448
Work order requests have been handled according to standard building routine, as has been exterminating.

In a message dated 12/14/2011 2:29:51 P.M. Central Standard Time, MFrazzetto@accessliving.org writes:

Herbert,

If I may call you Herbert, I will be leaving the office shortly to attend to another matter. If you wish to speak with me in person, my schedule tomorrow morning is as follows: I should be in the office at around 9:00 am cst, be at my desk till around 9:45 cst, then be back at my desk at 11:00 am.

Thank you,

Mark Frazzetto

---

**From:** HHFisher1@aol.com [mailto:HHFisher1@aol.com]
**Sent:** Wednesday, December 14, 2011 1:41 PM

**To:** Mark Frazzetto
**Subject:** Re: Anton Brown\Diane Mattingly\United Winthrop Towers

Mr. Frazzetto

I acknowledge receipt of this fax.  I am ;presently working from another location other than my office.  My office has the fax, is scanning it and mailing it to me.

I am hopeful so being able to respond before the end of the day, or the latest tomorrow morning.

Herbert H. Fisher

Vonnage line : 312 335 0448

In a message dated 12/14/2011 11:50:59 A.M. Central Standard Time, MFrazzetto@accessliving.org writes:

Mr. Fisher, I have faxed a copy of my demand letter in the above referenced matter to your office.  Therefore, a hard copy of this correspondence is now available to you.

Mark Frazzetto

Volunteer Staff Attorney Civil Rights Department

Access Living of Metropolitan Chicago

mfrazzetto@accessliving.org

ph:  312.640.2179

# EXHIBIT 5

# UNITED WINTHROP TOWER COOPERATIVE

4848 N. WINTHROP AVENUE
CHICAGO, ILLINOIS 60640
(773) 728-4848 PHONE
(773) 728-8768 FAX

January 27, 2012

Mr. Anton Brown
4848 N Winthrop #1908
Chicago, IL 60640

Dear Mr. Brown;

In regards to your hearing before the UWTC Board of Directors, the Board has decided to place you and the members of your household on 1- year probation.

Please understand that if there are any more incidents involving yourself, members of your households or guest to your household the board will move for immediate eviction.

Also as an additional condition of your probation you must pay all outstanding occupancy charges within 30 days of the date of this letter

We hope that you find this decision to be satisfactory and that there will be no further incidents involving any members or guest to your household.

Sincerely

Carolyn Bridges
Manager

# EXHIBIT 6

# UNITED WINTHROP TOWER COOPERATIVE

# OCCUPANCY AGREEMENT

(Post-Closing)

# UNITED WINTHROP TOWER COOPERATIVE
## OCCUPANCY AGREEMENT
### TABLE OF CONTENTS

|  | | Page No. |
|---|---|---|
| **ARTICLE 1–OCCUPANCY CHARGE** | | 2 |
| 1.1. | Operating | 2 |
| 1.2. | Management | 2 |
| 1.3. | Taxes | 2 |
| 1.4. | Insurance | 2 |
| 1.5. | Utilities | 2 |
| 1.6. | Reserves | 2 |
| 1.7. | Repairs | 2 |
| 1.8. | Mortgage | 3 |
| 1.9. | Other | 3 |
| **ARTICLE 2–PROPORTIONATE SHARE** | | 4 |
| **ARTICLE 3–AUTOMATIC RENEWAL/MEMBER'S TERMINATION** | | 4 |
| **ARTICLE 4–MEMBER'S ADDITIONAL RESPONSIBILITIES** | | 4 |
| 4.1. | Government Regulations | 4 |
| 4.2. | Family and Guests | 5 |
| 4.3. | Insurance and Neighbors | 5 |
| | 4.3.1. Insurance | 5 |
| | 4.3.2. Interfere | 5 |
| | 4.3.3. Noise | 5 |
| | 4.3.4. Nuisance | 5 |
| | 4.3.5. Illegal Acts | 5 |
| 4.4. | Illegal and Drug Activity | 6 |
| 4.5. | Indemnification | 6 |
| 4.6. | Liens Against Cooperative Property | |
| **ARTICLE 5–DWELLING UNIT TO BE USED FOR RESIDENTIAL PURPOSES ONLY** | | 6 |
| **ARTICLE 6–OCCUPANCY SUBLETTING WITHOUT CONSENT OF COOPERATIVE** | | 7 |
| **ARTICLE 7–TRANSFERS** | | 7 |
| **ARTICLE 8–MANAGEMENT, TAXES, AND INSURANCE** | | 7 |

**ARTICLE 24—HOUSING ASSISTANCE PAYMENT**  15

  24.1. Adjustment  15
  24.2. Changes in Family Income  15
  24.3. Family Composition  15
  24.4. HAP Ineligibility  16

**ARTICLE 25—SAVINGS CLAUSE**  16

**ARTICLE 26—OCCUPANTS**  16

## UNITED WINTHROP TOWER COOPERATIVE
## OCCUPANCY AGREEMENT

THIS AGREEMENT, made and entered into this 25th day of November, 2008, by and between UNITED WINTHROP TOWER COOPERATIVE, an Illinois General Not-For-Profit Corporation (hereinafter referred to as COOPERATIVE), having its principal office and place of business at 4848 North Winthrop Avenue, Chicago, Illinois:

and ██████████████████████████

(hereinafter referred to as MEMBER); and

WHEREAS, the Cooperative is the Owner of the building located at 4848 North Winthrop Avenue, Chicago, Illinois, (hereinafter referred to as the PREMISES), with the intent that its members shall have the right to occupy the dwelling units therein under the terms and conditions hereinafter set forth; and

WHEREAS, the Member is the owner and holder of a certificate of membership of the Cooperative and purchased the membership certificate with the good faith intention to reside in the premises; and

WHEREAS, the Cooperative has purchased the premises at the above addresses and in which the dwelling unit described below is located; and

WHEREAS, the Member has certified to the accuracy of the statements made in the Member's application and family income and size survey and agrees and understands that the family income, family composition, and other eligibility requirements are substantial and material requirements of the Member's occupancy;

NOW THEREFORE, in consideration of the mutual promises contained in this Agreement, the sufficiency of which is hereby acknowledged by each of the parties hereto, the Cooperative hereby gives the exclusive right of occupancy to the Member and the member hereby takes from the Cooperative for Member's occupancy the dwelling unit described below on the terms, conditions, and limitations contained in this Agreement, the Cooperative's Articles of Incorporation and By-Laws and rules and regulations of the Cooperative not or later adopted or amended.

DWELLING UNIT: Apt. 905, 4848 North Winthrop Avenue, Chicago, Illinois.

INITIAL ANNUAL OCCUPANCY CHARGE: $ 10,380

INITIAL MONTHLY OCCUPANCY CHARGE INSTALLMENT: $ 865.00

INITIAL NET MONTHLY OCCUPANCY CHARGES AMOUNT: $ 225.00

EFFECTIVE DATE: November 25, 2008

UNITED WINTHROP TOWE    OOPERATIVE OCCUPANCY AGREEME(    Page 3

housing associations of which the Cooperative may be a member, fees or dues arising from the provisions of any Regulatory Agreement entered into by the Cooperative, auditing, legal and consulting fees incurred in connection with the conversion of the premises to cooperative ownership and related repair and/or rehabilitation or the expense of any other conversion or related repair and/or rehabilitation work, except to the extent such fees and expenses have been paid for with funds from mortgages described in Section 1.8 of this Article 1 and Article 17 hereof.

**OCCUPANCY CHARGES DETERMINED BY BOARD:** The Board of Directors shall determine the amount of the Annual Occupancy Charge annually, but may do so at more frequent intervals, should circumstances require. No Member shall be charged with more than that Member's proportionate share, as determined by the Board of Directors under the provisions hereof. The amounts of the Occupancy Charge allocated to payment of the principal of the mortgage note or notes of the Cooperative, to funding the Reserve for Replacements, or to any other capital expenditures shall be credited upon the books of the Cooperative to the "Paid-In-Surplus" account as a capital contribution by the Members.

**AMOUNT:** Until further notice from the Cooperative, the Occupancy Charge for the dwelling unit described above shall be in the amount set forth above as the Initial Annual Occupancy Charge (plus the Initial Annual Additional Occupancy Charge (Utilities), if any). Said charges are subject to change as provided in this Article 1.

**TIME OF PAYMENT:** If the Effective Date is other than the first of a month, the Member shall make a payment of the applicable Monthly Occupancy Charge and Utilities Installments prorated to cover the unexpired balance of the month. Thereafter, the Member shall pay the Monthly Occupancy Charge and Utilities Installments in advance on the first day of each month. Unless otherwise agreed in writing, any additional Occupancy Charge, other than the Additional Occupancy Charge (Utilities), shall be payable on the first of the month following the month during which it was first billed to the Member.

**RENT:** Occupancy charges are also understood by the parties to mean "rent" as used in Statutes of the State of Illinois.

**ARTICLE 2–PROPORTIONATE SHARE:** For the purposes of determining liability for occupancy charges (not including utilities furnished to the dwelling unit by the Cooperative, metered separately and billed additionally to the member, if any) hereunder, the Member's proportionate share (defined as the proportion of the first Initial Annual Occupancy Charge for the dwelling unit described above bore to the total of all Occupancy Charges charged to all dwelling units pursuant to the Cooperative's first estimate of expenses (budget) set forth in ⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) is

.3566 %

or

UNITED WINTHROP TOWE COOPERATIVE OCCUPANCY AGREEMEI

**4.3.   Insurance and Neighbors:**  not do or permit anything to be done or kept upon the premises which will

   **4.3.1.   Insurance:**  increase the rate of insurance on the building, or on the contents thereof,

   **4.3.2.   Interfere:**  obstruct or interfere with the rights of other occupants,

   **4.3.3.   Noise:**  annoy other occupants by unreasonable noises or otherwise,

   **4.3.4.   Nuisance:**  create any nuisance on the premises, or

   **4.3.5.   Illegal Acts:**  be an illegal act.

**4.4.   Illegal and Drug Activity:**  It is specifically additionally agreed between the undersigned parties that:

   **4.4.1.**  The Member, any member of the Member's household, or a guest or other person under the Member's control shall not engage in criminal activity, including drug-related criminal activity, on or near any property owned by the Cooperative;

   **4.4.2.**  The Member, any member of the Member's household or a guest or other person under the Member's control shall not engage in any act intended or reasonably likely to facilitate criminal activity, including drug related criminal activity, on or near any property owned by the Cooperative;

   **4.4.3.**  The Member and any member of the Member's household shall report to the Cooperative and, if appropriate, to the police any and all criminal activity, observed on or near any property owned by the Cooperative, and shall, if requested, aid in the prosecution and/or eviction of the individuals involved;

   **4.4.4.**  It is acknowledged and understood that unlawful activities include, but are not limited to, acts of violence that damage or destroy a dwelling unit or other Cooperative property or that disturb or injure other residents or anyone else, whether in a dwelling unit, in common areas or otherwise on the premises owned by the Cooperative; and that "drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute or use of a controlled substance (as defined by Section 102 of the Controlled Substances Act (21 U.S.C. 802));

**ARTICLE 6–OCCUPANCY SUBLETTING WITHOUT CONSENT OF COOPERATIVE:**
The Member shall not assign this Agreement, sublet the dwelling unit or any part thereof, or permit occupancy by an person other than those hereinafter listed (if any), without the written consent of the Cooperative, at a rate and on a form approved by the Cooperative, except such person as are born to or are legally adopted by Member after the effective date hereof. The occupancy of persons born to or legally adopted by Member shall be promptly recorded with the Corporation, which reserves the right to terminate this agreement if such additional occupancy results in occupancy of more than 2 persons per bedroom for a period of more than 6 months.

The liability of the Member under this Agreement shall continue notwithstanding the fact that Member may have sublet the dwelling unit with the approval of the Cooperative, and the Members shall be responsible to the Cooperative for the conduct of Member's sublessee. Any unauthorized subleasing or occupancy shall, at the option of the Cooperative, result in the termination of member's rights hereunder under such conditions as may be prescribed by the Cooperative's Board of Directors.

**ARTICLE 7–TRANSFERS:** Neither this Agreement nor the Member's right of occupancy shall be transferable or assignable except in the same manner as may now or later be set forth for the transfer or sale of Cooperative Interests in the By-Laws of the Cooperative.

The Member certifies that neither the Member nor anyone authorized to act for the Member will refuse to see the Cooperative Interest, after the making of a bona fide offer, or refuse to negotiate for the sale of, or otherwise make unavailable or deny the Cooperative Interest to any person on the basis of race, color, religion, or national origin. Any restrictive covenant on Cooperative property relating to race, color, religion, or national origin is recognized as being illegal and void and is specifically disclaimed. Civil action for prevention or relief may be brought in any Court with jurisdiction against any person responsible for a violation of this certification.

**ARTICLE 8–MANAGEMENT, TAXES, AND INSURANCE:** The Cooperative shall provide necessary management, operation and administration of the Cooperative; pay or provide for the payment of all taxes or assessments levied against the premises and/or the Cooperative; procure and pay or provide for the payment of fire insurance and extended coverage and other insurance as required by any mortgage upon the premises; procure and pay or provide for the payment of such other insurance as the Cooperative may deem advisable. The Cooperative will not, however, provide insurance on the Member's right of possession described in this Agreement or on the Member's personal property of the Member's improvements to the dwelling unit.

**ARTICLE 9–UTILITIES:** The Cooperative is currently choosing to provide the following utilities to the Member:

gas[ ]                    water[ ]                    sewer[ ]

UNITED WINTHROP TOWE    COOPERATIVE OCCUPANCY AGREEMEN                         Page 9

Cooperative is required to repaint the dwelling unit to a light color, then the Member shall reimburse the Cooperative for its redecorating and repainting costs.

**ARTICLE 11–ALTERATIONS AND ADDITIONS:** The Member shall not, without the prior written consent of the Cooperative, make any structural alterations in the premises or in any connected water, gas, or steam pipes, electrical conduits, plumbing or other fixtures or remove any additions, improvements, or fixtures from the premises.

If the Member for any reason shall cease to be an occupant of the premises, Member shall surrender to the Cooperative possession of the dwelling unit, including any alterations, additions, fixtures and improvements made to the premises owned by the Cooperative.

The Member shall not, without the prior written consent of the Cooperative, install or use in Member's dwelling unit any air conditioning equipment, washing machines, clothes dryers, electrical heaters, water beds, or power tools. The Member agrees that the Cooperative may require the prompt removal of any such items at any time, and that Member's failure to remove such items upon request shall constitute a default within the meaning of Article 12 of this Agreement.

**ARTICLE 12–DEFINITION OF DEFAULT BY MEMBER AND EFFECT THEREOF:** At any time after the happening of any of the events specified in clauses 12.1 through 12.13 of this Article, the Cooperative may (at its option) give notice to the Member that all of Member's rights under this Agreement, including member's right to occupy the dwelling unit, will be terminated at a date not less than ten days thereafter. If the Cooperative so proceeds, all of the Member's rights under this Agreement will expire on the date so fixed in such notice, unless in the meantime the default has been cured in a manner deemed satisfactory by the Cooperative. It is the intention of the parties to create hereby conditional limitations, and it shall thereupon be lawful for the Cooperative to re-enter the dwelling unit and to remove all persons and personal property therefrom, either by summary dispossess proceedings or by suitable action or proceeding at law or in equity or by any other proceedings which may apply to the eviction of tenants or by force or otherwise, and to repossess the dwelling unit and return it to its former state as if this Agreement had not been made.

12.1.   In the event, at any time during the continuance of this Agreement, the Member shall cease to be the owner and legal holder of a membership of the Cooperative.

12.2.   In the event the Member attempts to transfer or assign this Agreement or sublease the dwelling unit in a manner inconsistent with this Agreement or any provision of the By-Laws of the Cooperative.

12.3.   In the event, at any time during the continuance of this Agreement, the Members shall be declared as bankrupt under the laws of the United States.

**DISPOSSESSION:** The Member expressly waives all right of redemption, if any, in case member shall be dispossessed by judgment or warrant of any Court or Judge; the words "enter" and "re-entry," as used in this Agreement, are not restricted to their technical legal meaning, and in the event of a breach or threatened breach by the Member of any of the covenants or provisions hereof, the Cooperative shall have the right of injunction and the right to invoke any remedy at law or in equity, as if re-entry, summary proceedings, or other remedies were not herein provided for.

**LANDLORD-TENANT RELATIONSHIP:** The Member expressly agrees that there exists under this Occupancy Agreement a landlord-tenant relationship and that, in the event of a breach by the Member of any covenant or provision of this Agreement, there shall be available to the Cooperative such legal remedy or remedies as are available to a landlord for the breach or threatened breach under the law by a tenant of any provisions of a lease or rental agreement.

**NON-WAIVER:** The failure on the part of the Cooperative to avail itself of any of the remedies given under this Agreement shall not waive or destroy the right of the Cooperative to avail itself of such remedies for similar or other breaches on the part of the Member. The failure of the Cooperative to enforce any of its rules or regulations, shall not be deemed to have been a waiver of any Cooperative right unless such waiver be in writing and signed by the Cooperative.

After the service of notice or the commencement of a suit or after final judgment for possession of the premises, the Cooperative may receive and collect any Occupancy Charges due, and the payment of the Occupancy Charges or other charges shall not waive or affect the notice, suit or judgment.

No payment by the Member or receipt by the Cooperative of a lesser amount than the stipulated Occupancy Charges or any other amount that may be fixed pursuant to these provisions shall be deemed to be other than on account, nor shall any endorsement or statement on any check or on any letter accompanying any check or payment of the Occupancy Charges be deemed an accord and satisfaction. The Cooperative may accept such a check or payment without prejudice to its right to recover the balance of unpaid Occupancy Charges or pursue any other remedy in this agreement or by law provided.

**ARTICLE 13–LATE CHARGES AND OTHER COSTS IN CASE OF DEFAULT:** In addition to the other sums that have become or will become due pursuant to the terms of this Agreement, the Member shall pay to the Cooperative, a late charge as an additional Occupancy Charge in an amount to be determined from time-to-time by the Board of Directors for each payment or sum, or part thereof, due the Cooperative more than 10 days in arrears.

If a Member defaults in making a payment of Monthly Occupancy Charges, Additional Occupancy Charges or other charges, or in the performance of observance of any provision of this Agreement, and the Cooperative has obtained the services of any attorney with respect to the defaults involved, the member covenants and agrees to pay to the Cooperative any costs or fees involved, including reasonable attorney's fees, notwithstanding the fact that a suit has not yet been instituted.

shall be required by any such mortgagee or regulator. In confirmation of such subordination, the Member shall, at any time and from time to time on demand, execute any instruments that may be required by any mortgagee or by the Cooperative for the purpose of more formally subjecting this Agreement to the lien of any such mortgage or mortgages or the requirements of such Regulatory Agreements; and the Member hereby appoints the Cooperative and each of its officers, and any future officer, Member's irrevocable attorney-in-fact during the term hereof to execute any such instrument on behalf of the Member, and the member hereby ratifies any such instrument hereafter executed by virtue of the power of attorney hereby given. The Member does hereby expressly waive any and all notices of default and notices of foreclosure of any such applicable mortgage and/or any such regulatory agreement which may be required by law. In the event a waiver of such notice is not legally valid, the member does hereby constitute the Cooperative as Member's agent to receive and accept such notice on the Member's behalf.

**ARTICLE 18–COOPERATIVE'S RIGHT IN EVENT OF EVICTION:** In case of any default hereunder, the Cooperative shall have all rights for re-entry, expiration and/or dispossession by summary proceedings, proceedings pursuant to Chapter 735, Article IX of the Illinois Code of Civil Procedure (Forcible Entry and Detainer statute of Illinois), or any amendment thereto or otherwise:

18.1. **Expenses:** all charges hereunder shall become due immediately; and in the event of re-entry by Member or dismissal or abandonment by Cooperative of any such action, Member shall be liable for all such charges which shall be paid by the Member up to the time a new Member executes an Occupancy Agreement for the dwelling unit, this Agreement expires or is terminated by the Member pursuant to Article 3 hereof, or the Cooperative exercises its option to purchase the Member's Cooperative Interest as defined in the Cooperative By-Laws, together with such expenses as the Cooperative may incur for legal expenses, attorneys fees, and/or putting the dwelling unit in good order, or for preparing the dwelling unit for re-rental.

18.2. **Reletting:** the Cooperative may re-let the unit or any part of the dwelling unit either in the name of the Cooperative or otherwise, for a term or terms which may at the Cooperative's option be less than or exceed the period which would otherwise have constituted the balance of the term of this Agreement any may grant concessions or free housing charges; and/or the Member or the legal representatives of the Member shall also pay the Cooperative, as damages for the failure of the Member to observe and perform the Member's covenants herein contained, any deficiency between any Occupancy Charges hereby reserved and/or covenanted to be paid and the net amount, if any, of the Occupancy Charges collected on account of this agreement for each month of the period which would otherwise have constituted the balance of the term of this Agreement. In computing such damages there shall be added to said deficiency such expenses as the Cooperative may incur in connection with re-letting, such as legal expense, attorney's fees, advertising, resale fees, brokerage fees and expenses and for keeping the dwelling unit in good order, and any suite brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of the Cooperative to collect the deficiency for any such subsequent month by a

UNITED WINTHROP TOWE  )OPERATIVE OCCUPANCY AGREEMEN        Page 15

**ARTICLE 23–PATRONAGE REFUNDS:** The Cooperative, acting through its Board of Directors, shall, in its sole discretion, have the right, but not the obligation, to refund or credit to each Member (within 90 days after end of each fiscal year) that Member's proportionate share of sums that have been collected in anticipation of expenses which are in excess of the amount needed to pay for the actual expenses incurred by the Cooperative, including the accumulation of various reserves.

**ARTICLE 24–HOUSING ASSISTANCE PAYMENT:** The Cooperative is a party to a Housing Assistance Payment Contract with the Secretary of the United States Department of Housing and Urban Development (Secretary) which provides that the Secretary will pay a portion of the Occupancy Charges on behalf of qualified members. Pursuant to said Contract, the Secretary has approved the Monthly Occupancy Charges specified in Article 1 for the dwelling unit described on page 1 hereof and it has been determined that Member is eligible for housing assistance payments in an amount equal to the difference set forth between the Monthly Occupancy Charges and the Net Monthly Occupancy Charges set forth on the first page hereof. In addition to the conditions recited above, the Member agrees that the following conditions shall be applicable so long as Member receives the benefit of housing assistance payments hereinabove described or in any other amount as the member shall be from time to time entitled to have paid by the Secretary of the Cooperative for Member's benefit; or there is not an amount filled in for Net Monthly Occupancy Charges at the time of execution hereof (on page 1 hereof), the following special conditions shall become applicable at any time during such periods of time as the Member shall be entitled to receive and does receive the benefit of such housing assistance payments:

24.1.   **Adjustment:** Member agrees, that in the event that the housing assistance payment is adjusted to reflect income or occupancy change of the members of the Member's household, to pay in lieu of the Net Monthly Occupancy Charge hereinbefore described, or as may then be applicable, the difference between the Monthly Occupancy Charge and the adjusted amount of the housing assistance payments. The Cooperative agrees to give 30 days written notice to the Member immediately upon such adjustment stating the new amount the Member is required to pay as Member's share of the Monthly Occupancy Charge.

24.2.   **Changes in Family Income:**   Member agrees to report immediately to the Cooperative if Member's total family income increases to or is more than 3.33 times the Monthly Occupancy Charge from time to time applicable to the dwelling unit occupied by the Member.

24.3.   **Family Composition:** Member understands that the housing assistance payment and Member's share of the Monthly Occupancy Charges are subject to adjustment to reflect income and family composition changes and agrees to be bound by such adjustment as required from time to time.

UNITED WINTHROP TOWER COOPERATIVE OCCUPANCY AGREEMENT      Page 17

**NONE** (strike if inapplicable and list names, ages, and relationship to Member)

| Name | Age | Relationship |
|------|-----|--------------|
| ██████████ | ██ | |

MEMBER SHALL PROMPTLY REPORT ANY ADDITIONS TO OCCUPANCY BY BIRTH OR LEGAL ADOPTION OR ANY REDUCTION IN HOUSEHOLD COMPOSITION BY DEATH OR MOVE-OUT. [MEMBER SHALL APPLY FOR WRITTEN APPROVAL FOR ANY OTHER CHANGE IN OCCUPANCY PRIOR TO SUCH CHANGE IN OCCUPANCY TAKING PLACE.]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be signed and sealed the day and year first above written.

UNITED WINTHROP TOWER COOPERATIVE:

By _Carolyn Bredsen_ (SEAL)

(CO-)MEMBER(S):

███████████ (SEAL)

_____ (SEAL)

This Document Drafted By
HERBERT H. FISHER
200 North Dearborn Street, Suite 1006
Chicago, IL 60601
(312) 346-9690

Copyright © 1993 Herbert H. Fisher, Esq.
All rights reserved – use licensed to United Winthrop Tower Cooperative

3c/UnitedPos.OA/3-22-97/3-24-97/4-10-97/8-11-97/4-12-99/lw
OCCUPANCY AGREEMENT.doc/02-02-04/bpc

3.   **Removal of Subsidy:**

a.   The Member understands that assistance made available on his/her behalf may be terminated if events in either items 1 or 2 below occur. Termination of assistance means that the Cooperative may make the assistance available to another Member and the Member's occupancy charges will be recomputed. In addition, if the Member's assistance is terminated because of criterion (1) below, the Member will be required to pay the HUD-approved market occupancy charges for the unit.

    (1)   The Member does not provide the Cooperative with the information or reports required by paragraph 1 or 2 above within 10 calendar days after receipt of the Cooperative's notice of intent to terminate the Member's assistance payment.

    (2)   The amount the Member would be required to pay towards occupancy charges and utilities under HUD rules and regulations equals the Family Gross Occupancy charges shown on the HUD form or forms in use at any given time.

b.   The Cooperative agrees to give the Member written notice of the proposed termination. The notice will advise the Member that, during the ten calendar days following the date of the notice, he/she may request to meet with the Cooperative to discuss the proposed termination of assistance. If the Member requests a discussion of the proposed termination, the Cooperative agrees to meet with the Member.

c.   Termination of assistance shall not affect the Member's other rights under this Agreement, including the right to occupy the unit. Assistance may subsequently be reinstated if the Member submits the income or other data required by HUD procedures, the Cooperative determines the Member is eligible for assistance, and assistance is available.

4.   **Penalties for Submitting False Information:** Knowingly giving the Cooperative false information regarding income or other factors considered in determining Member's eligibility and occupancy charges is a material noncompliance with the lease subject to termination of occupancy. In addition, the Member could become subject to penalties available under Federal law. Those penalties include fines up to $10,000 and imprisonment for up to five years.

5.   **Unit Transfer Policy:**   Member shall follow the Internal Transfer Policy as outlined in the Cooperative's Membership Selection Criteria. Internal transfers are allowed only to meet HUD requirements regarding family size or to assist in meeting the needs of physically challenged members.

3

7.   if the Member is fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that in the case of the State of New Jersey, is a high misdemeanor;

8.   if the Member is violating a condition of probation or parole under Federal or State law;

9.   determination made by the Cooperative that a household member's abuse or pattern of abuse of alcohol threatens the health, safety, or right to peaceful enjoyment of the premises by other residents;

10.   if the Cooperative determines that the Member, any member of the Member's household, a guest or another person under the Member's control has engaged in the criminal activity, regardless of whether the Member, any member of the Member's household, a guest or another person under the Member's control has been arrested or convicted for such activity.

d.   The Cooperative may terminate this Agreement for other good cause, which includes, but is not limited to, the Member's refusal to accept change to this agreement. Terminations for "other good cause" may only be effective as of the end of any initial or successive term.

The term material noncompliance with the lease includes: (1) one or more substantial violations of the lease; (2) repeated minor violations of the lease that (a) disrupt the livability of the project; (b) adversely affect the health or safety of any person or the right of any Member to the quiet enjoyment to the leased premises and related project facilities, (c) interfere with the management of the project, or (d) have an adverse financial effect on the project (3) failure of the Member to timely supply all required information on the income and composition, or eligibility factors, of the Member household (including, but not limited to, failure to meet the disclosure and verification requirements for Social Security Numbers, or failure to sign and submit consent forms for the obtaining of wage and claim information from State Wage Information Collection Agencies), and (4) Non-payment of rent or any other financial obligation due under the lease beyond any grace period permitted under State law. The payment of rent or any other financial obligation due under the lease after the due date but within the grace period permitted under State law constitutes a minor violation.

5